```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JENNY RAMGOOLIE,

              Plaintiff,

         v.                              16 Civ. 3345 VEC SN

ANDY RAMGOOLIE,

              Defendant.

------------------------------x


                                         October 4, 2017
                                         3:14 p.m.



Before:

                    HON. SARAH NETBURN,

                                         U.S. Magistrate Judge




                         APPEARANCES

HOWARD ADAM BENDER,
     Attorney for plaintiff


TERRY ANTHONY BROSTOWIN
     Attorney for defendant
```

1               (In open court)

2               (Case called)

3               THE COURT:  Good afternoon.  Please be seated.

4               I have Mr. Bender's September 14 letter.  I have given

5      Mr. Brostowin an opportunity to respond.  I don't have a

6      responsive letter, so I wanted to make sure you didn't submit

7      one and it got lost?

8               MR. BROSTOWIN:  I did not.  I figured it would save it

9      for today.

10              THE COURT:  All right.  So I want to talk about these

11     issues here.  Obviously, the case has shifted a little bit with

12     the appearance of Mr. Bender, and I have reviewed his letter

13     and I have done some legal research on my own.  How shall we

14     begin?  Mr. Bender, is there anything to add to what you have

15     in this letter?

16              MR. BENDER:  No.  I think the letter sets forth my

17     arguments fairly.

18              THE COURT:  Mr. Brostowin, let's set aside how many

19     interrogatories.  I feel like that is a collateral issue.  I

20     want to focus more on this issue of the types of documents that

21     are being sought.  So why don't you tell me your position on

22     that.

23              MR. BROSTOWIN:  My position is the documents that are

24     being sought now, if I would just start through his list, as

25     this Court well knows, the issue is now limited to strictly to

1    liability and not to valuation.

2              The first document being sought are my client's three
3    years worth of tax returns, 2014 through 2016.  I do not see
4    how that goes to liability in terms of whether or not there is
5    a contract, an agreement, any type of promise to give the
6    plaintiff any monies in a corporation.  It is strictly a tax
7    return.

8              THE COURT:  A personal tax return?

9              MR. BROSTOWIN:  A personal tax return, that is
10   correct.  I find that inappropriate.  We can go one-by-one, but
11   the vast majority of all of the other document requests are
12   document requests from corporations, not from my client,
13   corporations that have been dismissed, corporations that are
14   not within the United States of America, and specifically Anco
15   has not been conducting business for, I don't have exact, but I
16   think over a year now.

17             THE COURT:  As I understand counsel's argument, he is
18   saying that here is what we know.  We know there was this
19   company Anco, we know that your clients had I think one of two
20   shares in the beginning and then the shares switched.

21             Is that factually correct?

22             MR. BROSTOWIN:  I don't think it was on or two, but he
23   had more shares initially, and those shares, according to my
24   client, were readjusted downward because that was an error.
25   That is the position that has been taken for a long time in

other litigation.

>    I don't want to say irrespective of whether or not what his percentage was of Anco at any one particular point in time, it is down to I believe 6 percent, I could be mistaken because I am doing different corporations now.  It is below 15 percent, 6, 8, I am not exactly sure what it is.

>    THE COURT:  Does anybody have shares in Anco?

>    MR. BROSTOWIN:  Anco has not conducted business for I think over a year now, no income, no expense, no anything, no business.

>    THE COURT:  What I understand the plaintiff's position to be is that Mr. Ramgoolie had a certain number of shares.  At a later point in time that was coincident with the breakdown in the relationship between Jenny and Andy, Andy reduced the number of his shares and redistributed the shares in a way that would prevent Jenny from getting any sort of control or ownership over the company, and so as I understand the plaintiff's position is that the documents surrounding that transaction as well as the transaction of shutting down Anco and starting up KDR in the same location with the same employees and the same materials, et cetera, would be circumstantial evidence in support of the argument that there once was an agreement between these two parties and that Andy was taking action that had no other legitimate business reason, and only the reason is to sort of limit his sister's

1  opportunity for ownership and shares.
2           MR. BROSTOWIN:  I will say --
3           MR. BENDER:  Your Honor, that is incredibly accurate.
4           MR. BROSTOWIN:  -- I will say what has been
5  characterized as coincidental or current in time when Jenny
6  filed the lawsuit actually predated that quite a bit.  There is
7  other litigation, as this Court well knows.  My client is in
8  the middle of a divorce proceeding of which these proceedings,
9  there is supposed to be no transfer of documents between one
10 proceeding to the other, especially since matrimonial is
11 confidential in nature.
12          Andy has and had no control over the closing of Anco,
13 the setting up of KDR.  That was strictly done by I believe it
14 was Kevin and Jeremy, so that was not -- I understand what the
15 allegation is, but at the point in time that that occurred, he
16 had I want to say 6 percent, but I don't want to be married to
17 that number, but a very low percentage in the company.
18          He had no control in terms of any operation of the
19 company since 2014, three years ago.  I have documents to show
20 that.  I have a document from the accountant saying that my
21 client has received ever since the formation of Anco until the
22 day that it no longer ceased doing business, that he received
23 not one dollar from that company, he never received any
24 proceeds from that company.  So he was not as involved as
25 Ms. Ramgoolie, the plaintiff, is leading one to believe.

THE COURT:  Isn't it a little bit odd, he was plainly formative in the creation of Anco, right?

MR. BROSTOWIN:  Yes.

THE COURT:  So he creates this company.  Ms. Ramgoolie thinks it is successful.  I have no idea whether it is or not.

He creates this company and at a certain point he gives up his interests without any sort of explanation.  Maybe he sold them.  That would be relevant.  It seems like from the outsider perspective that he is just moving stuff around and giving up rights and assets without a sort of legitimate business reason.  I think that is what is animating this inquiry.

MR. BENDER:  That is for the purpose of frustrating her efforts of showing that the arrangement that they came to was fruitful, that it developed into Anco, that it was a 50 percent partner.  In fact, when Anco started, Mr. Ramgoolie did have one share.  I believe Kevin Ramgoolie had the other share.

Those shares were then diluted until 6 percent, but the mother of Jenny and Andy, I believe, obtained somewhere in the neighborhood of maybe 45 percent of the shares, to a point where if you compare the mother's shares with Andy's shares, they had a controlling interest, exactly 51 percent of the company.

Ms. Ramgoolie has also testified that while she was the bookkeeper at Anco, this was in 2014, the company was, in

1    fact, very profitable.  She has also testified that
2    Mr. Ramgoolie wanted to rearrange his profitability from the
3    company from being a shareholder to actually selling the
4    company, merchandise, importing the merchandise from the United
5    States and reselling it to Anco and made his money back that
6    way.  We are thinking that is what actually happened here, is
7    that he is getting rid of his shares and he is making it up by
8    creating companies and selling merchandise to Anco and possibly
9    not KDR.
10             MR. BROSTOWIN:  I don't know where she testified.
11   There is a lawsuit out there also I don't know about.
12             MR. BENDER:  It is alleged in the complaint.
13             MR. BROSTOWIN:  Be that as it may, my client has --
14   again there is other litigation -- has taken the position that
15   the shares that I guess diluted or gave away, whatever term is
16   going to be used, the initial creation was in error.  It was an
17   accounting error.  That is the position he has always taken in
18   the litigation, more specifically in the matrimonial
19   litigation.  It is not a reallocation of his equity in the
20   company.  It was just a correction of the formation of the
21   shares when it was formed initially.
22             THE COURT:  That seems like a big mistake.
23             MR. BENDER:  Considering the fact there is now three
24   other shareholders that are part of the company that are
25   somehow left out of the original.  Even if that is the case,

1    prove it, provide us the documentation so our theory of the
2    case can be disproven.
3             MR. BROSTOWIN:  All the shareholders live in Trinidad
4    and Tobago and they're family members, as-is the plaintiff
5    here.  This is a familial case right here.  It is not like they
6    were given to strangers.  They worked the business, they do
7    things, make the operational decisions for the company, so
8    those type of things, the operation had always been done in
9    Trinidad and Tobago, that is where the company is and was and
10   is.  So he is here in New York.  They're doing it down in
11   Trinidad.
12            I have been doing this long enough to know there are
13   times when people start a company, they start to divest
14   themselves of the company, other people are working.  Instead
15   of putting financial equity into it, they could be putting
16   sweat equity, work equity, intellectual equity.  There are
17   things that people do.
18            THE COURT:  That is the exact theory he is,
19   Mr. Ramgoolie is bringing.
20            MR. BROSTOWIN:  The issue being if other people gain
21   equity in a company, where they did not have when it initially
22   started, I think the intimation is that my client intentionally
23   had given it to them for nothing, a nefarious transfer of
24   shares in a company.  That is what I think I am hearing unless
25   I am wrong.

1           THE COURT:  Other than relevance, do you have any
2    other objection here to these documents?
3           MR. BROSTOWIN:  My client does not have control of
4    them.  He had no operational control since 2014.  So he does
5    not have the ability to get the records from Trinidad and
6    Tobago, and I think there needs to be a distinction between
7    Anco and KDR, maybe, maybe not.
8           MR. BENDER:  We have not asked for any documents from
9    KDR.
10          MR. BROSTOWIN:  Maybe I could be wrong.  If I am, I
11   apologize.
12          MR. BENDER:  The fact they are family members which
13   Mr. --
14          MR. BROSTOWIN:  No, you did ask about KDR.
15          MR. BENDER:  I asked about KDR, what in terms of what
16   transfer of shares or --
17          THE COURT:  Can I encourage you to speak more slowly?
18          MR. BENDER:  KDR's reference in the request is as a
19   possible party providing consideration for the shares or assets
20   of Anco.  I have not asked for any documents for KDR.
21          MR. BROSTOWIN:  Look at Request No. 2, documents
22   evidencing governmental filings.  I don't know how my client
23   will get governmental filings from a company in another
24   country.
25          MR. BENDER:  As he said before, every shareholder of

1  this company is part of the Ramgoolie family.  It is not as
2  though there are 15 other shareholders and he wasn't a
3  controlling member and he doesn't know who these shareholders
4  are.
5           These are his nephews.  They should be able to provide
6  him the documents.  The fact it is a foreign corporation and
7  the documents may be located outside of the jurisdiction of
8  this Court does not mean he does not have control over these
9  documents, which means he should have documents over them and
10 be able to provide.
11          MR. BROSTOWIN:  One cannot say they have control,
12 access and care and control of the documents since the person
13 they're getting it from is a family member.  The plaintiff is a
14 family member also.  I don't know how willing she would be to
15 giving documents to my client if it were not requested as part
16 of a document request.
17          MR. BENDER:  If she were a the shareholder of the
18 company, that would change the equation.
19          THE COURT:  I don't need you all to have a
20 conversation in front of me.  I will order Andy Ramgoolie to
21 produce documents related to Anco on the following topics:
22          Documents related to shares -- I'll start from
23 chronologically -- documents related to the corporate creation
24 of Anco, ITS structure, any corporate bylaws, et cetera,
25 documents related to shareholders of Anco, to the extent that

there ever was a change in the number of shares that are issued and who becomes a shareholder, all of the documents related to that including any communications that Andy has that involved decisions to transfer shares, reduce shares, dilute the number of shares.

And then documents that relate to the transfer of assets, both real and intellectual, from Anco to KDR, so those will be documents that reflect Anco's transfer of assets as to KDR. I am not looking for documents, not ordering the documents related to what KDR is doing now or its corporate structure at this point. It is just the transfer from Anco to KDR.

I am satisfied, based on the information I have and based on my knowledge of the case and the facts here, that Andy does have access to these corporate records based on his relationships and his role in the creation and growth of Anco. I will order these documents be produced.

With respect to Mr. Ramgoolie's tax returns, that I don't see a basis for unless there is an argument on it.

MR. BENDER: There isn't, your Honor.

As part of this overall equation here, what we are looking for is if the shares and assets were transferred, were they transferred for fair value. As part of that equation, we would need to assess what was the value of Anco during the time of these two transactions. While we don't necessarily need his

1   tax returns, we would request that some documentation be

2   provided so we could have an understanding in terms of what the

3   actual value of Anco was while these to transactions took

4   place.

5           MR. BROSTOWIN:  It is my position liability needs to

6   be established first before valuation would be addressed.

7           THE COURT:  Again I think the argument that is being

8   made here is that if this is a sham transaction designed to

9   block Jenny Ramgoolie from her ownership interests, which would

10  be demonstrated through significant asset transactions without

11  any exchange of money, that that would be evidence or would be

12  consistent with their prior agreement to share this asset, and

13  so I agree with you that I am not requiring discovery on

14  damages now and what the ultimate value of the asset is.

15          I think the types of documents I just ordered to be

16  produced I think would cover what Mr. Bender is referencing, so

17  any documents that relate to the corporate decision to go from

18  two shares to 10,000 shares, presumably assigned some sort of

19  value to that transaction, and then the distribution of all

20  these shares to people who previously were not shareholders,

21  there should be some record as to how the corporation is

22  valuing that.

23          So those documents need to be provided, and again to

24  the extent that Anco is transferring all of these assets to KDR

25  that they be paid for, the value of these assets, again, real

1  and intellectual, those documents have to be turned over as
2  part of the liability theory here.
3              MR. BROSTOWIN:  What may complicate this somewhat
4  eventually is that my client's wife is taking a marital
5  property value to anything, anything that is held in Trinidad
6  and Tobago, specifically Anco, it will be alleged, is KDR,
7  whatever, that may complicate issues down the road, just to
8  throw it out there.
9              THE COURT:  I am sure it will, but I don't know that
10 there is any solution.
11             MR. BROSTOWIN:  I am just making a statement to your
12 Honor.
13             THE COURT:  The Anco documents need to be produced.
14 The tax returns do not need to be produced.
15             With respect to the interrogatories, it seems like an
16 issue that could be resolved by the parties.  Interrogatories
17 often have limited efficacy, so I am going to allow the
18 plaintiff to select 15 interrogatories to serve on Andy
19 Ramgoolie.  I believe that would be adequate.
20             MR. BROSTOWIN:  There may have been less than 15 asked
21 for.
22             MR. BENDER:  In more recent version there were.
23             MR. BROSTOWIN:  In less than 15?
24             MR. BENDER:  Less than 15.
25             THE COURT:  Off the record.

1           (Off-the-record discussion)
2           THE COURT:  Thank you.  So as to the production of
3  documents, so we are in early October, today is October 4th,
4  let's have those documents, I would like your clients make
5  every effort to produce them as quickly as possible on an
6  rolling basis.
7           MR. BROSTOWIN:  I may have some of the documents.  I
8  may have some of the documents.
9           THE COURT:  Wonderful.  I will set an absolute
10 backstop of November 1st, but it should be a rolling
11 production.
12          MR. BROSTOWIN:  Whatever I do have that is responsive
13 I will get over to Mr. Bender immediately.
14          THE COURT:  Anything further from either side?
15          MR. BROSTOWIN:  No.
16          MR. BENDER:  No.
17          THE COURT:  Thank you.
18          (Court adjourned)
19
20
21
22
23
24
25