UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

JENNY RAMGOOLIE,

                    Plaintiff,

                                            16-CV-03345(VEC) (SN)

        -against-

ANDY RAMGOOLIE,

                    Defendant.

------------------------------------------------------------x

## OBJECTIONS

A Dialysis Center serves patients three times per week, without dialysis patients die. AANDCO now KDR serves approximately 200-250 patients per week, provides approximately 2760 (actual invoice 3/31/2018) treatments per month with reimbursement from the Ministry of Health in Trinidad and Tobago. Revenue per month TT$2,622,000 and US$393,693. Annual revenue of TT$31,464,000 and US$4,663,636. Plaintiff is the founder of this business and Defendant the co-founder with equal ownership 50/50. Plaintiff would have never sold this business; it was supposed to be generational for her family heirs and Defendant's children, of at least I million each per year. The sale of this business is a sham, and it continues to operate until today 7 years later into 2022 as a viable venture. See summary of invoices and checks and Exhibit 14 in original damages submission plus new list of checks issued by the Ministry of Health from 2018 thru 2021. Exh 1 and Exh 2.  The valuation of AANDCO is at  TTD 180,491,916 USD 26,818, 210 When all else fails we hope Justice prevails.


Plaintiff, in pro se, submit the following objections to the Report and Recommendation dated November 24, 2021 prepared by the Honorable Sarah Netburn:

## Preliminary Statement

1.     On November 24, 2021, Hon. Sarah Netburn submitted a Report and Recommendation with the following conclusion:

> I recommend that the Court award Plaintiff $398,380 TTD in damages. I recommend that the Court decline to award damages on any other legal theory and decline to award attorney's fees and costs beyond what this Court has already ordered. Finally, I recommend Plaintiff be awarded pre-judgment interest to be calculated at a rate of nine percent of $398,380 TTD, accruing from January 15, 2016.

2.     In the Report and Recommendation, Hon. Netburn considered the factual allegations in the Complaint as deemed admitted except the section concerning the amount of damages.

> The following facts are established by the admissible evidence submitted for this inquest and the allegations in the Complaint, which are deemed admitted except to the extent they concern the amount of damages. See Greyhound, 973 F.2d at 158.
> According to Plaintiff, in July 2010, she and Defendant Andy Ramgoolie orally agreed to open a dialysis center in Trinidad and Tobago. Compl. at ¶¶ 1, 34–35; ECF No. 274 (Pl's Proposed Findings of Fact and Conclusions of Law, hereinafter, "FFCL"). Specifically, Plaintiff asserts she and Defendant agreed that Defendant would "pay the start-up costs," and she would conduct research, file the appropriate permit paperwork, design the center, source the necessary equipment, set up the supply chains, and develop the company's "internal operations procedures
> and paperwork." Id. at ¶¶ 1, 36. Plaintiff asserts that they further agreed that after the dialysis center opened, Defendant would be reimbursed, she would run the center as "Director of Clinical Operations," and Plaintiff and Defendant would each own half of the venture, and profits and losses would be shared equally. Id. at ¶ 1. Defendant has continually denied that there was any
> such agreement. See Ramgoolie, 333 F.R.D. at 32; ECF No. 297 at 5. Plaintiff conducted her research for the dialysis clinic from July 2010 to December 2012. Id. at ¶ 37. She submitted a business plan to Defendant in May 2012, and in December 2012, she emailed Defendant and reminded him of their "50/50 business deal." Id. at ¶¶ 38–39. Defendant did not respond in writing. Id. at ¶ 40. In 2013, Plaintiff asserts that she and Defendant agreed to keep her name off the corporate paperwork for the dialysis center, AANDCO Health Care Ltd. ("AANDCO"). Compl. at ¶¶ 3, 4. Plaintiff's son was involved in a court case that Plaintiff and Defendant were worried would negatively impact the way the company was perceived by Trinidadian authorities. Id. (p.6, R and R)

Plaintiff maintains they agreed that her name would be added to the paperwork "after the resolution of [the] family crisis." Id. at 3. Thus, in April 2013, AANDCO was incorporated in Trinidad and Tobago with Kevin Ramgoolie, Plaintiff's and Defendant's nephew, listed as director and receiving a monthly salary. Id. at ¶¶ 41, 43. The corporate filings list Kevin and Defendant as corporate directors. Id. at ¶ 44. Plaintiff alleges that, unbeknownst to her, Kevin later amended the corporate paperwork for AANDCO to reflect Jeremy Ramgoolie, his brother and Plaintiff and Defendants' nephew, as another corporate director. Id. at ¶ 46. A June 30, 2014

Annual Return of a Company for Profit for AANDCO reflected Defendant and Kevin as the company's sole shareholders with one share apiece. Id. at ¶ 48. AANDCO opened in July 2014, with Plaintiff as the Director of Clinical Operations. Id.

at ¶ 5. Plaintiff asserts that soon after AANDCO opened, she had to use her own funds to pay AANDCO's bills. Id. at ¶ 6. (p.7, R and R)

3.      Hon. Netburn also granted leave for Plaintiff to submit additional documents along with her objections. Thus, this Objections attach documents that may not have been submitted in earlier pleadings by Plaintiff.

4.      It is also worth mentioning that Hon. Netburn submitted the following recommendation in her Report and Recommendation dated August 3, 2018 to the Motion for Summary Judgment.

In addition, I recommend instructing the jury at trial that it may draw an adverse inference based on Defendant's failure to produce certain documents during discovery. Therefore, I recommend that the Court give the following jury instruction at trial: Before trial, the Court ruled that the defendant had failed to produce records that were in his possession and control regarding Aandco's issuance of shares to Kevin Ramgoolie, Jeremy Ramgoolie, and Annie Ramgoolie and Aandco's subsequent transfer of its assets to KDR. If you find that these records would have been material in deciding facts in dispute in this case, then you are permitted, but not required, to infer that this evidence would have been unfavorable to the defendant.

## DISCUSSION

*The accountant's valuation report adopted*
*A methodology which produced a reliable indicator*
*Of the fair market value of AANDCO, thus,*
*Proving damages with reasonable certainty*
-----------------------------------------------

5.      Central to the contract reached by parties is that Plaintiff is entitled to half of AANDCO's fair market value. However, Judge Netburn found that Plaintiff's has not

submitted documentation for the Court to assess the valuation. Quoting the relevant portions of the Report:

> Plaintiff again provides little to support any calculation; she submits AANDCO's 2017 annual return of a company for profit, which indicates that the company has 10,000 shares, valued at $1 per share. See ECF. NO. 271, Ex 11. The return also shows that AANDCO carried $150,000 in debt, which exceeds the value of the shares. Id. The Court is again left without any basis by which to calculate Plaintiff's damages regarding any shares she might be owed. Nevertheless, Plaintiff has provided one concrete figure with documentation: in an agreement dated January 15, 2016, AANDCO was purchased by KDR Medical Care Ltd. For $796,760 Trinidad and Tobago Dollars ("TTD"). See ECF No. 271, Ex. 19.

6.      Plaintiff respectfully begs to differ. Shanaz Sukhdeo is being employed as an expert witness to come up with the valuation of the company. As qualified accountant, he used Discounted Cash Flow (DCF), an accounting method and principle in valuing the company. A complete and full report of his valuation is attached as Exhibit 3. The summary of his report is as follows:

> Based on the figures provided, I first calculated the attached unit economics, the profit for one unit sold, for each dialysis treatment provided, invoiced at TT$950. The unit economics uses the market rate for medical supplies – the real price AANDCO HCL would have paid to other sellers, to show the real profit per unit.

> The net profits roll forward for reinvesting such as expansion and for shareholders to take from the company as dividends – so these represent lost income or gains to you as well. The net profits computations are from 2016 to 2019. Past net profits attributable to all shareholders of the company are not adjusted downwards for the time value of money. Instead, interest is usually computed and payable because you lost use of these funds from then to know.

> Then I estimate future earnings, at a growth rate of a very conservative 5% per year and discounted to present value at 10%. The lower growth rate of 5% also factors in increases in costs, instead of using a 10% growth rate and increasing costs annually. The decade calculated is from 2020 to 2029. A ten year projected revenue is standard when valuating companies that are expected to be around for longer than 10 years. These projections are attached.

> Combined, these calculations give a company valuation of:

One hundred and Eighty Million, Four hundred and ninety-one thousand,
Nine hundred and sixteen TTD = TTD$180,491,916.00
OR
Twenty-six million, Eight hundred and eighteen thousand, Two hundred and
ten USD =
USD26,818,210.00

7.    Federal Rule of Evidence 702 requires that a witness who claims to be an
expert based on knowledge, skill, experience, training, or education may testify in the
form of an opinion or otherwise if she meets four criteria:

- The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence to determine a fact in the issue;
- The testimony is based on sufficient facts or data;
- The testimony is the product of reliable principles and methods; and
- The expert has reliably applied the principles and methods to the facts of the case.

7.    In the case United States v. Mitchell, 365 F.3d 215, the Court ruled as follows:

Judge Selya has put it well:

*Daubert* does not require that a party who proffers expert testimony carry
the burden of proving to the judge that the expert's assessment of the
situation is correct. As long as an expert's scientific testimony rests upon
"good grounds, based on what is known," it should be tested by the
adversary process--competing expert testimony and active cross
examination--rather than excluded from jurors' scrutiny for fear that they
will not grasp its complexities or satisfactorily weigh its inadequacies. In
short, *Daubert* neither requires nor empowers trial courts to determine
which of several competing scientific theories has the best provenance. It
demands only that the proponent of the evidence show that the expert's
conclusion has been arrived at in a scientifically sound and
methodologically reliable fashion.

*Ruiz-Troche v. Pepsi Cola Bottling Co.*, 161 F.3d 77, 85 (1st Cir.
1998) (citations omitted) (quoting *Daubert*, 509 U.S. at 590)
(citing *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir.
1997); *Paoli II*, 35 F.3d at 744), *quoted in part in In re TMI Litigation*,
193 F.3d at 692. [**81]  Good grounds for admission plainly exist here.

8.    In *Hipple v. SCIX, LLC*, U.S. District Court, E.D. Pennsylvania (2014)], the
plaintiff's expert completed a "Calculation of the Value of SCIX" to find a reasonably

equivalent value for the "transfer of SCIX's assets as of October 13, 2010." The defendant argued that the plaintiff's expert's proposed testimony failed both the fitness and reliability restrictions set forth in *Daubert* because he completed only a limited "calculation of value" rather than a more extensive "opinion of value." The court rejected the defendant's argument and concluded that the proposed testimony of the plaintiff's expert was admissible. It stated that "both a Calculation of Value and Opinion of Value are engagements approved of by the American Institute of Certified Public Accountants." The court relied on *United States v. Mitchell* [365 F.3d 215, 244 (3d Cir.2004)]: "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." The expert relied on a multiple of seller's discretionary income as grounds, and the valuation agreement was not restricted by the client. It is important to note that while the expert used only one approach to value, it was his own independent estimate of value. Many critics of calculated values question the independence of the expert when using an approach to value agreed to by the client. This does not impede or restrict the expert's independence if the valuation analyst is free from client-imposed scope limitations.

9.      In *Ward v. Ward*, 350 Wis. 2d 505 (2013)] The appellate court ruled that "circuit courts are not required to accept any one method of valuation over another." The petitioner-respondent's expert testified that the calculation of value was the appropriate approach for a business of this type, and the circuit court was persuaded that this methodology produced a reliable indicator of fair market value. The expert used the capitalization of earnings methods with no scope restrictions placed by the client.

10.      Applying the foregoing legal citations, Shanaz Sukhdeo is a known expert in the area of accountancy. His comprehensive resume is attached as Exhibit 4. He used relevant data and documents to support his valuation. He used reliable methods such as DCF in supporting her findings. "Many authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow ("DCF") method. *See, e.g., Frymire-Brinati v. KPMG Peat Marwick,* 2 F.3d 183, 186 (7th

Cir.1993) (referring to DCF method as "the methodology that experts in valuation find essential").

11.     Sukhdeo's valuation report satisfies the requirement under the Federal Rules for the submission documents and data and arrived at using acceptable and reliable accounting principles and methods. The well anchored valuation report should provide reasonable basis for the Court to award Plaintiff's breach of contract damages. of an expert testimony. The calculations are supported by relevant

12.     Sukhdeo used the reports and that was kept by Aandco and actual invoices and Checks submitted by the Ministry of Health to arrive at his valuation. See Exh 1 & 5

**For revenue**, the service provided is standard or fixed, for every patient, every month and the invoice or selling price, indicated on the invoices you sent me showing the billings to the Ministry of Health and the checks received from the Ministry of Health, is also standard or fixed. The service is the same so the process is the same for every invoice and will be the same for every future billing. Total revenue is then simply multiplying the indicated invoice price of $950 by the number of units for each month or each year – exactly what is done by AANDCO HCL staff to invoice the Ministry of Health.

**For expenses**, in detail, the unit economics to determine net profits per unit and per year were arrived at from the files sent to me by you (including spreadsheets of payments – these spreadsheets are not bank statements). I extracted detailed figures for medical supplies (imported and local), direct labour (nurses), indirect labour (office staff, other), rent, maintenance of equipment, waste disposal, other overheads in my calculations.

13.     See 379 Eastman Co. v. Southern Photo Co., 273 US 359 - Supreme Court 1927 - 107 "The plaintiff had an established business, and the future profits could be shown by past experience. It was permissible to arrive at net profits by deducting from the gross profits of an earlier period an estimated expense of doing business. Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate." This, we think, was a correct statement of the applicable rules of law. Furthermore, a defendant whose wrongful conduct has rendered difficult

the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible. Hetel v. Baltimore & Ohio R.R., 169 U.S. 26, 39. And see Lincoln v. Orthwein (C.C.A.), 120 Fed. 880, 886. We conclude that plaintiff's evidence as to the amount of damages, while mainly circumstantial, was competent; and that it sufficiently showed the extent of the damages, as a matter of just and reasonable inference, to warrant the submission of this question to the jury. The jury was instructed, in effect, that the amount of the damages could not be determined by mere speculation or guess, but must be based on evidence furnishing data from which the amount of the probable loss could be ascertained as a matter of reasonable inference. See also Autowest, Inc. v. Peugot, Inc., 434 F. 2d 556-Court -of -Appeals, 2nd Cir

14.     CPA, Mr. Dave Lindemann, from Austin Texas, USA states, that he supports the valuation of Mr. Shanaz, upon reviewing the documents. His letter and resume is attached to this filing. Exh.6.

***The Alleged Asset Purchase Agreement
Is a sham document thus it does not reflect
The accurate valuation of the company***
-------------------------------------------------------

*15.*     There is a sufficient indicia of continuity that KDR is nothing but AANDCO in disguise. There is no change of ownership because the same officials are behind KDR. KDR uses the same location, machinery and equipment, while producing the same product - dialysis center. It essentially employed same workforce. KDR is the alter ego of Aandco, and that is a disguised continuance of the first company and the transfer of assets was a sham transaction which was designed to totally eliminate Plaintiff from the picture and thus completely dodge contractual obligation of Defendant. The alter ego doctrine focuses on the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets. ( *International Union of Operating Engineers, Local 150 v. Centor Contractors, Inc., 831 F.2d 1309, 1312 (7th Cir. 1987)*

8

16.     Being a sham document, the Court should not give credence to the understated consideration amounting to $796,769 TTD. This asset sale is made up of TV's , fans and a generator and other miscellaneous items. There is no mention of the value of a million dollar government contract, goodwill, and customers and an operational running profitable business. The sales in January 2016 was TT$1.7 million under AANDCO and in February and March under KDR the sales were similar almost equivalent. This is a minuscule amount and even considered a nominal consideration when compared to the real valuation of the business which is TTD$180,491,916.00 or USD26,818,210.00. The agreement between the parties is to split ownership as 50-50 of the company. Plaintiff and Defendant would each own half of the venture, and profits and losses would be shared equally. As 50% owner of the company, Plaintiff is entitled to USD13,409,105.

***Plaintiff is entitled to reliance***
***Damages for pre-AANDCO***
***Operation***
-----------------------------------

In her Report and Recommendation, Judge Netburn found that there is no documentary evidence to award the sum of $500,000.00 for the extensive research she conducted before and after the dialysis centered opened from 2010 to 2014. She, however, conceded that plaintiff provided a detailed list of tasks describing her work for AANDCO. For brevity, the following is reproduced as follows with the corresponding number of hours and costs incurred.

**RESEARCH AND PLANNING  2010-2012**

1. Identify the type and cost of the Machinery on or about July 2010.
2. Had an oral agreement with my brother to set up the Dialysis Center in Trinidad in July/August 2010
3. Identify a need for Dialysis Business in Trinidad & Tobago on or about 5/9/2012. Pg
4. Hired Merritt to do research on machinery, supplies and staffing on about 4/1/2012. Pg 117,118,351,
5. Sent a questionnaire to Trinidad on the possibility on opening a Dialysis Clinic and the governmental willingness to work with the private sector and the re-imbursement rates if any by the government. Pg 91
6. Created a business plan to assess the if this business would be successful.
7. Reminded my brother of our oral agreement and to get started – Dec 2012.

**CONSTRUCTION – PURCHASE AND SET UP OF EQUIPMENT - 2013**

8. Visited Trinidad in Feb 2013 and met with Kevin and Mike on the space to assess how the clinic will be set up. - copy of passport -defense has a copy.
9. Drew the first layout of the center. In file
10. Provided an Architect in Trinidad for part of the project. Pg 4, 85
11. Negotiated with Gia Medical for the purchase of Dialysis Machinery on about 2/27/2013. Pg60, 122
12. Reviewed supplies and sourced supplies with Merritt- 4/17/13 and various dates – pg 190
13. Followed up with Andy and Merritt on the purchase of equipment and shipment of Container 1 and 2. On or about 6/5/2013 and other dates Pg 1,68
14. Followed with Merritt and Andy on the payment of the equipment, as Deryck was holding funds for Andy, he would submit the payment.
15. Sourced other supplies locally to ship container 3 to Trinidad, medical supplies, office supplies and cleaning supplies. On or about 7/7/13 and various dates Pg 57,238,71
16. Obtained and shipped crash cart for the clinic. Pg 81-
17. Reviewed the status and update on Construction progress pg 348
18. Reviewed Summary and status of project on or about 2/18/13- pg 88
19. Set up an appointment for Andy and Merrit to visit a local Dialysis Clinic in Trinidad, St. Augustine Private Hospital and to meet their nephrologist DR. Poon King. Merrit and Andy met with the doctor and toured the clinic.

## LICENSURE – COMPLIANCE AND REGULATIONS - 2013

20. Coordinated initial water testing with the Government agency WASA in Trinidad on the type of water in the local area of the Dialysis Clinic. Pg 194 – water report
21. Coordinated with local Health Inspector of Trinidad, Public Health in Couva to make a visit and make any recommendations to the center. 5/15/13 and other dates Pg 230, 305
22. Informed Merritt to have the local Fire Department to come in make an unofficial inspection, this will help identify and need for EXIT signs, fire extinguishers, EXIT plan etc and in preparation for the final Fire Inspection. 5/15/13 and other dates   Pg 230
23. Reviewed application for licensure – pg. 42
24. Reviewed copy of brochure and suggested changes and updates. Pg 49
25. Post – initial inspection by the Government, informed Kevin to put a plan in place, include Parking spots, a sign for Community service, letter from landlord and tried to assist with a building permit clearance for the building.
26. Received update on Chief Medical officer visit to the center pg 353
27. Reviewed Checklist for Government Audit with Merritt for Trinidad Government pg 209,210
28. Worked in setting up binders for the Policies and Procedures for the Dialysis Center. Pg 58

## HUMAN RESOURCES – PRE- HIRE – PREPARATION - 2013

29. Reviewed and set up Job Descriptions – pg 15 of Red file #1
30. Met with MInah and Mike at the Hyatt in Trinidad on the same trip in Feb 2013 to discuss Minah working for the center and getting employees to work there as well. Minah told me that trainees came to her center and she will choose the best ones to work at our center.
31. Informed Merrit to look for Nephrologists and Dialysis nurses in Mexico, Columbia, Venezuela and India. Pg 59,77,202,275,344
32. Reviewed resumes that we received for the first batch of Employees. Pg

33. Put an ad in the newspapers for Employees. 9/13/13 Pg 133
34. Reviewed Dr. Boris resume and request requirements to be the nephrologist for the center, suggested to Andy, he will not work out, he wants too much money and we are a new start-up. 9/23/13 Pg 127
35. Negotiation with DR. Raj to be Medical Director – pg 188
36. Discussed with Dereck to formulate a doctor's contract to be the Medical Director of the Clinic. Pg 34

### PREPARING FOR START -UP  Jan – July 2014

37. In April 2014 – wrote the Prime Minister a letter as the AANDCO was completed and waiting over 8 months and still no license to operate.
38. In May 2014 -in desperation and looking for an alternative to the investment by Andy, thought to put the center up for sale, Plaintiff put an advertisement in the Newspaper. Plaintiff was thinking of a price of TT$10 million, but Andy sent her an email saying ask for $15 million.

Gleaning from the foregoing, total hours is 320 at $250 and total cost is $80,000. The Plaintiff, however is of the mindset the quality of her work to establish this multi-million dollar venture is way above a infinite computed value of hours and cost but more towards the value and being the founder of a business to be a contribution of approximately $500,000 close to the equivalent on the investment of the defendant. In putting together this document, which has been quite stressful and emotional, there has been numerous documents, time, phone conversations that there is insufficient time to document and add value to be computed. It is quite scary to know that it can boil down to $80k, in the alternative Plaintiff requests a sum of $500,000. For research, planning and set up of a $26 million dialysis center.

For his part, Defendant neither confirms nor denies that Plaintiff carried out all of these tasks from 2010 to 2014, Defendant claims that Plaintiff was simply an "administrator and employee" of Aandco, not an owner of the business.

Plaintiff is entitled to reliance damages to enable her to recover identifiable costs incurred in reliance on the breaching party's promise, where the breaching party could reasonably foresee that they would be incurred. Assuming the Court finds proof adduced falls short of the expectation damages, an alternative award is reliance damages.

Thus, in the case of *Nature's Plus Nordic A/S v. Natural Organics, Inc., 98 F. Supp. 3d 600, 605,* the Court awarded reliance damages where expectation damages cannot be proven with reasonably certainty, Said the Court:

"United States District Judge Shira A. Scheindlin recently delineated the two different forms of redress under New York law in breach of contract suits, namely, "expectation damages" and "reliance damages."

Expectation damages provide the injured party with the benefit she would have enjoyed had no breach occurred— i.e., they aim to fulfill the injured party's expectations from the contract.13 Reliance damages, by contrast, seek to restore the injured party to the position she was in before the contract was formed. They allow for recovery of "expenditures [the injured party] made in reliance on defendant's representations and that he otherwise would not have made." Under New York law, when expectation damages defy precise calculation, reliance damages are the appropriate remedy."

In the case of *Abraham v. Leigh, 471 F. Supp. 3d 540, 565*, the Court awarded Plaintiff for the costs incurred in the preparation stage. This is similar to the present case where Plaintiff expended time, effort and money from 2010 to 2014 for the pre-AANDCO operation. Quoting the Court in *Abraham*:

"Reliance damages ... are intended to 'place plaintiffs in the same position as they were prior to the execution of the contract[.]'" *Summit Props. Int'l, LLC v. LPGA*, No. 07 Civ. 10407 (LBS), 2010 U.S. Dist. LEXIS 128825, 2010 WL 4983179, at *5 (S.D.N.Y. Dec. 6, 2010) (quoting *V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F. Supp. 1188, 1198 (S.D.N.Y. 1994)); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 344(b) (1981) (damages for "reliance interest" put promisee "in as good a position as he would he would have been in had the contract not been made"). Reliance damages allow a plaintiff to recover "his expenses of preparation and of part performance, as well as other foreseeable expenses incurred in reliance upon the contract." *Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720, 729 (2d Cir. 1992).

"Reliance damages concern money spent by the plaintiff in preparation for or partial performance of the agreement, not investments made by third parties." 24/7 Records, Inc. v. Sony Music Entm't, Inc., 566 F. Supp. 2d 305, 319 (S.D.N.Y. 2008).

In the case of *Shlasinger v. Yarrington, 2018 U.S. Dist. LEXIS 137914, \*27*, the Court found the award of reliance interest as an alternative to expectation interest:

New York law provides that, "as an alternative to expectation-based damages," under such circumstances, "a plaintiff may recover 'damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.'"

Plaintiff, without a doubt, has spent considerable time, money and effort for several years preparatory for the full performance of the contract with Defendant. Apply Shlasinger, Plaintiff implores the Court to award to her full reliance interest.

Based on the detailed documents adduced, reliance damages are recoverable because they are not speculative in nature and Defendant knew about the efforts expended by Plaintiff and they are certainly within the contemplation of parties. More importantly, it is through these efforts that AANDO, when it started its operations in 2014, benefited from those efforts providing strong foundation for the company to succeed in its business. "[R]eliance damages are recoverable 'provided they are proximate in effect, and are not speculative or uncertain in character and were fairly within the contemplation of the parties when the [contract] was made, or might have been foreseen as a consequence of a breach of its covenants.'" *St. Lawrence Factory Stores v. Ogdensburg Bridge & Port Auth., 121 A.D.3d 1226, 1227, 994 N.Y.S.2d 704, 706 (3d Dep't 2014)(quoting Friedland v. Myers, 139 N.Y. 432, 436, 34 N.E. 1055 (1893))*.

Assuming for the sake of argument that Plaintiff is unable to prove contract damages with reasonable certainty. Still, in several cases, the Court has awarded reliance damages in lieu of expectation damages. Thus in *Alto Lending, LLC v. Altobridge Ltd., 2018 U.S. Dist. LEXIS 9937, \*19*, the Court ruled: 'As set out above, where damages stemming from a breach of contract are certain, but the calculation of the preferred method of damages — expectation damages — is not, a court may instead award reliance damages to place a plaintiff in the same position as it was "prior to the execution of the contract." *Summit Properties*, 2010 U.S. Dist. LEXIS 128825, 2010 WL 4983179, at \*5 (internal citations and quotations omitted). Here, Plaintiff has provided sufficient support for most of its claimed reliance damages by submitting a Declaration, made under penalty of perjury, by a person with knowledge

(Schupak), attesting to the fees customarily charged by Plaintiff for its services (*see* Schupak Decl. ¶ 8), and providing copies of at least some attorney invoices to support Plaintiff's claim that it incurred legal fees and expenses in connection with its work on the joint venture, before the venture's collapse (*see id.*, Exs. B-D).'

Thus, from the foregoing, Plaintiff prays the award of $500,000 representing reliance interest or $80,000 in the alternative.

### *Plaintiff is entitled to her full*
### *Salary as Director of Clinical Operations*
-----------------------------------------------

The agreement of the parties is for the company to pay Plaintiff monthly salary in the amount of $10,000.00. From the year 7/2014 to Jan 2016 , the sum of $180,000. Plaintiff served as Director of Clinical Operations for the company. Thus far, neither the company nor the Defendant paid a dollar to Plaintiff. Even Defendant does not deny the fact that Plaintiff worked for the company. In her Report to the Motion for Summary Judgment, Judge Netburn observed as follows:
'Although Defendant neither confirms nor denies that Plaintiff carried out all of these tasks from 2010 to 2014, Defendant claims that Plaintiff was simply an "administrator and employee" of Aandco, not an owner of the business.' Whatever denomination Defendant may have labeled Plaintiff, the fact remains that Plaintiff worked as employee for the company and in conformity with the agreement, she should be paid for the accumulated salaries over time.

In terms of control and management, there is no question that Plaintiff who is a registered nurse with a Master's Degree of Science in Health Administration managed the technical aspects / medical area of the dialysis center. No one else in management is qualified to do this - not Defendant, not Kevin, not Jeremy. Among other things, Plaintiff was in charge of staffing, including the hiring of the doctors; sourced and negotiated the supply of dialysis machines, managed the maintenance of the equipment, dealt with the government in procuring the licenses and permits, managed

and reviewed the company's financials, managed logistical issues such as water treatment and parking space for the center, coordinated with health and fire inspectors and etc. Plaintiff had full access to the and transactional authority with Aandco's online banking system at Republic Bank Limited. There are also numerous emails in which Plaintiff manages Kevin and Jeremy who are listed shareholders of the company. Plaintiff's role in the overall operations of the company is beyond cavil. See post AANDCO list of functions  Exh 7 broken down as follows: Operations, Human Resources, Financials and Patients.

Attached is a letter for Exhibit  9  from the Human Resources of River Spring Living stating that Plaintiff's salary from 2012 to 2015 is $103,000.00 annually. Tax returns are also attached as Exhibits 9 and W2 from 2012-2015.

The proof of salary earned by Plaintiff in New York should substantiate the relief for salary in this present case. While the company is in Trinidad and Tobago, the quality of work and professionalism of Plaintiff exhibited in her work in New York is the same quality discharged in her work in Aandco. Plaintiff has brought so much experience, skills and credentials to put up the company and it is because of her expertise as a health care professional in New York that she was able to apply everything that she learned in New York to put up the business in Trinidad and Tobago. The Trinidad and Tobago Government adapted AANDCO forms Plaintiff created, swapped it with their Ministry logo and made these forms for all private dialysis centers in Trinidad. The level of contribution and wealth of experience and skills expended by Plaintiff are necessary to propel the business to where it is today - a thriving, highly successful, money-making company.

*In the alternative, Plaintiff is entitled*
*To recovery based on quantum meruit*
*For the expenses incurred pre-Aandco*
*And for the salary earned during the*
*Company's operation*
--------------------------------------------

Plaintiff pleads, in the alternative, that she is entitled to damages based on the equitable doctrines of unjust enrichment and quantum meruit.

Under New York law, quantum meruit and unjust enrichment claims can be considered together as a "single quasi contract claim." *Mid-Hudson, 418 F.3d at 175.* This is because "quantum meruit and unjust enrichment are not separate causes of action;" rather, "unjust enrichment is a required element for an implied-in-law, or quasi contract, and quantum meruit, meaning 'as much as he deserves,' is one measure of liability for the breach of such a contract." *Seiden Assoc., Inc. v. ANC Holdings, Inc.., 768 F. Supp. 89, 96 (S.D.N.Y.1991)* rev'd on other grounds, 959 F.2d 425 (2d Cir. 1992). A claim for quasi contract may be pled in the alternative to a contractual claim. *See Fed. R. Civ. P. 8(d)(2).*

In the case of *Vioni v. Providence Inv. Mgmt., L.L.C., 648 Fed. Appx. 114, 116*, the Court detailed as follows: "Under New York law, quantum meruit plaintiff must show (1) good faith performance of services, (2) defendant's acceptance of services, (3) "expectation of compensation therefor," and (4) reasonable value of services (internal quotation marks omitted)); *Aluminum Fair, Inc. v. Abdella, 90 A.D.2d 603, 603, 456 N.Y.S.2d 184, 185 (3d Dep't 1982)* (explaining that, to prevail on quantum meruit claim, circumstances must imply "understanding on the part of both parties that there was an obligation to pay")."

Here, Plaintiff is alternatively praying for the award of damages on the basis of quantum meruit to prevent unjust enrichment. As abundantly discussed above, Plaintiff performed services from 2010 to 2014 prior to the full operations of Aandco. Not once did Defendant object to any performance of service by Plaintiff throughout those years. In fact, Defendant acknowledged the fact that Plaintiff performed her duties as administrator. Plaintiff expected compensation for the services rendered and she is asking for reasonable payment.

Where Defendant objects to the terms of the agreement, the Court can turn to the theory of quantum meruit to justify award of damages. In *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175-176,* the Court said: ("[A] party is not precluded from proceeding on both breach of contract and quasi-contract theories where . . . the contract does not cover the dispute in issue."); *see also U.S. East Telecomms., Inc. v. US West Communications Servs., Inc*., 38 F.3d 1289, 1298 (2d Cir. 1994) ("Recovery in quasi-contract outside the existing contract

may be had if a party has rendered additional services upon extra-contractual representations by the other party."). On the other hand, a plaintiff's entitlement to recover in quantum meruit outside of a valid contract may depend on a showing that the "'additional services' are 'so distinct from the [contractual] duties . . . that it would be unreasonable for the [defendant] to assume that they were rendered without expectation of further pay.'" *Id.* (quoting *O'Keeffe v. Bry*, 456 F. Supp. 822, 831 (S.D.N.Y. 1978) (further citation omitted)).

However, the coverage of the express contract here involves issues of fact, which cannot be resolved as the record stands. In particular, when Quantum meruit recovery is sought by a salaried employee for "services rendered which fall outside the scope of duties of (the expressly agreed to) employment," entitlement to recovery turns on the question whether the "additional services" are "so distinct from the duties of (the) employment that it would be unreasonable for the employer to assume that they were rendered without expectation of further pay.*" Robinson v. Munn, supra, 238 N.Y. at 43, 143 N.E. 784, 785.* The question of reasonable expectations is one of fact which remains for determination.

The catena of cases cited stands for the proposition that the Court can award damages that, despite the existence of an agreement, the breaching party strongly objects the coverage of performance in an agreement and that non-breaching party performed services outside the scope of the agreement. Here, Defendant, although he acknowledges that Plaintiff performed her duties as administrator refused to pay contending that the services were not part of the agreement and therefore non-compensable. This factual dispute is one of a question of reasonable expectation which the Court can looked into.

***The sham consideration of the Asset Sale
Cannot be the basis of an award for damages***
-------------------------------------------------------

As abundantly discussed above, there is a sufficient indicia of continuity that KDR is nothing but AANDCO in disguise. There is no change of ownership because the same officials are behind KDR. The purpose of the execution of the Asset Sale Agreement is to permanently remove Plaintiff from AANDCO and KDR. The agreement is

designed to skirt around the contractual obligations of Defendant to Plaintiff and make it appear that the new company KDR has nothing to do with Plaintiff and therefore barred from taking in the profits from KDR. The fraudulent purpose of the Asset Sale is demonstrated in the shockingly low consideration of the agreement. The Asset Sale consideration is a measly $796,769 TTD, a nominal consideration compared to the real valuation of the business which is TTD$180,491,916.00 or USD26,818,210.00. The consideration was understated by hundred fold.

The Asset Sale Agreement is one with an illusory consideration, thus, should be struck down. "[A]n illusory contract—that is, '[a]n agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation'— is 'unenforceable'" (*Lend Lease [US] Constr. LMB Inc. v Zurich Am. Ins. Co.*, 28 NY3d 675, 684, 49 N.Y.S.3d 65, 71 N.E.3d 556, quoting Black's Law Dictionary 370 [9th ed 2009]; *see Beitner v Becker*, 34 AD3d 406, 407, 824 N.Y.S.2d 155). *Toobian v Golzad, 193 A.D.3d 778, 783*

Where a contract has been executed to perpetrate fraud and it has a sham consideration, Courts have thumbed down its validity. A valuable consideration, however small or nominal, if given or stipulated for in good faith, is, in the absence of fraud, sufficient to support an action on any parol contract; and this is equally true as to contracts of guarantee as to other contracts. *Helmick v. Probst, 170 Misc. 284, 288*

In *Medical College Laboratory v. New York University, 178 N.Y. 153, 156*, the Court did not give credence to the nominal consideration of the contract and ordered a rehearing to show the real consideration of the contract. The Court said:

> Equity -- Admissibility of Evidence Showing Inducement for a Deed Expressing a Nominal Consideration -- Decree Directing Reconveyance Based upon Failure of Consideration. A deed executed by an incorporated medical college conveying property to a university with which the college had merely a nominal connection, reciting a consideration of one dollar and an agreement by the grantee to pay the grantor's debts, if any, expresses a nominal consideration only, where there are no debts, and the statute authorizing the conveyance provided that the rights of any creditors of the grantor should not be thereby impaired, and the resolutions of transfer and acceptance showed that the agreement to pay the debts formed no part of

the consideration; in such a case the real consideration may be shown by parol. Evidence, therefore, of negotiations prior to the deed, to the effect that the inducing cause of the conveyance was an oral statement made by a representative of the university having apparent, but not actual, authority, that if the college would turn over all its property to the university the medical committee of the council of the latter should have entire management and control of the college, which should succeed in the appointment of professors to the powers theretofore exercised by the medical faculty, and that the medical committee should always remain constituted of people acceptable to the medical faculty, supplemented by evidence that subsequent to the execution of the deed the university had placed itself in such a position that it could not carry out the agreement whereby it had acquired the property, will support a decree in equity directing its reconveyance.

From the foregoing, there is an abundant case law which stands for the proposition that the if the consideration of the contract is nominal and shockingly low compared to the real value of the contract, and the attendant circumstances are against a factual backdrop of fraud and malice, then the Court can set aside the stated consideration and consider other evidence to show the real consideration. With the sham consideration of the Asset Sale Agreement, the Court may not be able to use the stated consideration as a measure of damages.

***Defendant is guilty of fraudulent conveyance,***
***Thus, the sale should be avoided and revert to***
***Its original state***

----------------------------------------------------

Under the New York Debtor and Creditor Law (NYDCL) , a plaintiff can establish a constructive fraudulent conveyance if the transfer is made "without fair consideration." NYDCL §§ 273-75.

Fair consideration is given for property, or obligation,

> (a) When in exchange for such property, or obligation, as a fair
> equivalent therefor, and *in good faith*, property is conveyed or an
> antecedent debt is satisfied, or
> (b) When such property, or obligation is received *in good faith* to
> secure a present advance or antecedent debt in amount not
> disproportionately small as compared with the value of the property, or
> the obligation obtained.NYDCL § 272 (emphasis added).

Hence, a plaintiff may prevail by proving either the absence of an equivalent exchange of value *or* the lack of good faith by either the transferor or the

transferee. *LaMonica v. Harrah's Atl. City Operating Co. (In re JVJ Pharm. Inc.), 618 B.R. 408, 417-418*

The test is profitably analyzed as follows: (1) recipient of the debtor's property, must either (a) convey property in exchange or (b) discharge an antecedent debt in exchange; and (2) such exchange must be a "fair equivalent" of the property received; and (3) such exchange must be "in good faith." HBE Leasing Corp. v. Frank, 61 F.3d 1054, 1055

In the present case, KDR never received a 'fair equivalent' of the asset it purchased. It received way more than the stated value of the agreement. Not only was there an absence of fair consideration, there was also no good faith between the parties as the agreement was only meant to circumvent the contractual obligations of the Defendant to the Plaintiff. DCL §§ 278 and 279 set out remedies for creditors challenging fraudulent conveyances. Section 279 pertains to creditors whose claims have not matured. Section 278 pertains to creditors whose claims have matured, and provides:

> 1. Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or immediately from such a purchaser
> a. Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or
> b. Disregard the conveyance and attach or levy execution upon the property conveyed. HBE Leasing Corp. v. Frank, 61 F.3d 1054, 1058

Thus, as the Asset Sale Agreement was one of fraudulent conveyance, the sale should be set aside and be reverted to the original transferor which is AANDCO.

*The 2014 email of Defendant*
*Demonstrates that the 2014 valuation*
*Of the company is at 15Million TTD*
-----------------------------------------------

Attached as Exhibit 10 is an email dated May 7, 2014 between Plaintiff and Defendant wherein Plaintiff is asking Defendant how much he is willing to sell the business to which Defendant replied that he can sell it at 15 Million TTD.

Since 2014, the company has steadily grown in leaps and bounds bagging multi-million-dollar contracts from the government of Trinidad and Tobago. The exponential growth of the business proves the magnitude of valuation of KDR and directly runs afoul with the very low consideration of the Asset Sale Agreement.

Statement made by a party to the litigation which is inconsistent with his or her testimony in court or at a deposition taken by the party in the litigation is admissible under New York's admission exception to the hearsay rule and it may be testified to by anyone who heard it. Guide to NY Evidence ["Guide"] Rule 8.03. As stated by the Court of Appeals in *Reed v. McCord*, 160 N.Y. 330, 341 (1899): "[A]dmissions by a party of any fact material to the issue are always competent evidence against him [or her], wherever, whenever, or to whomever made."

The 2014 admission of the Defendant as shown in his email regarding the valuation of the company is a far cry from the stated consideration of the Asset Sale Agreement of 796,769 TTD and is certainly within the 2021 valuation of TTD$180,491,916.00 by the accountant considering that from 2014 to 2021, the business has enjoyed tremendous success thus boosting its valuation exponentially. As the content of the 2014 email originated from a party to this case, it should bind him as party admission. Thus, as of 2014, the valuation of the company is at 15Million TTD.

***KDR is earning millions just from the***
***Contracts it bagged from the government***

---

Of late, Plaintiff was able to retrieve copies of checks by asking them via Freedom of Information Act evidencing payment from the government of Trinidad and Tobago to KDR for the dialysis services. The following is a summary of the amount of the checks as payment to KDR:

2018 - 7 checks -

2019- 15 checks -

2020- 4checks -

2021- 11 checks -  this is only from Jan to July 2021

Grand total – 77,714,214 TT dollars - US$ 11,668,800. Copies of the checks are attached as Exhibits 2

It must be noted however, given time and distance constraints, Plaintiff was only able to procure the above-mentioned checks. Aandco and now KDR is thriving as a big business, partly owing to the huge government contracts it bagged. Just from the checks mentioned above, the amount totals 77,714,214 TT dollars    or US$ 11,668,800. The huge income of KDR belies the understated consideration of the Asset Sale Agreement and bolsters the computation of the valuation by the accountant. KDR will not reach the magnitude of success it is reaping now without the seminal seeds planted by Plaintiff for which Defendant blindly ignored.

### *The Devious Defendant*

First the defendant deprived the founder of her rights in the company, then wanted to sell goods four times the amount to AANDCO and when the Plaintiff stated that will cut into her share of the profits he was mad. A company called Direct Med in the same building as AANDCO and KDR now sells supplies to the dialysis center KDR. The directors are Kevin and Jeremy Ramgoolie, both of KDR and Direct Med. Andy, the defendant stated that he was the consultant to assist in purchasing supplies with no pay and has traveled to Medical conferences in Germany, and visited Australia and China for supplies. The sale of AANDCO to KDR, was signed by Jeremy Ramgoolie for the sale of AANDCO and for the purchase KDR by Kevin Ramgoolie

The court should note that Andy Ramgoolie owns a bar in Manhattan and did not sell that bar, but sold AANDCO. There was no proof of payment for the purchase of AANDCO. The court needs to note that since the start of this lawsuit, Andy, Kevin

and Jeremy had the same lawyers in New York and Trinidad. The court needs to know also not that AANDCO and KDR had the same lawyers in New York and Trinidad. The court needs to note that up until November 2019, Kevin, Jeremy and his Lawyer, Nadine in Trinidad provided declarations for Andy Ramgoolie in his motion for reconsideration of default judgement filed on December 5th 2019. The court needs to know that after the default judgement of Judge Caproni on September 10th 2019 that defendant flew to Trinidad in the same month of September 2019 to obtain the very documents to provide for discovery, from Kevin. In December, 2019 after submitting all of the they finally hired separate lawyers, and Defendant since hired one of the top lawyers in Trinidad and Tobago, Mr. Anand Ramlogan a lawyer who was once the legal representative of the Prime Minister of Trinidad and Tobago. Even these lawyers got more money more that Plaintiff ever did.

From the inception of this business and this case, Plaintiff has been in the David vs Goliath position. The defendant always had a position to hire the best lawyers, fly everywhere just to win this case. Defendant attempted to delay this case on numerous occasions file false documentation, have a fake sale, frustrate US courts and Trinidad courts, and just hoping to defeat the Plaintiff in many different ways for her to run out of money for lawyers and fuel to fight. I know how hard I worked to build this place, and I will fight for my fair share.

Plaintiff has submitted to affidavits in her prior damages submission where 2 employees swore that the defendant Andy was still the boss after the transfer from AANDCO to KDR and they continuously reported the same way, include a legal letter where Andy went to KDR claiming he was the boss in my damages filing. Defendant has continuously made numerous trips to Trinidad since the so-called sale. He consistently disobeyed court orders and now it seems it all is working in his favor, with the report and recommendation of Judge Netburn, he could not ask for a better award.

Judge Caproni, even noticed in her ruling on the default judgement dated 9/10/19 document 216 paragraphs 1 and 2 the following: "The court agrees with Judge Netburn that no accountant could conclude from a review of those documents whether AANDCO made any payments to Andy Ramgoolie". Paragraph 2 the Judge

states, "It is possible, of course, that the accountant's opinion (which was produced by the defendant for the first time during this litigation) is fraudulent." This Defendant is a trip and I sometimes wonder, how we belong to the same mother and father, seriously. He has consistently lied, fabricated many false documents in this case, did not cooperate with court orders and hides behind Kevin and Jeremy. If nothing he needs to be punished for his actions by rewarding the Plaintiff her rightful share of 50% of this million-dollar dialysis center. If this case is not thoroughly investigated, and fair award not given in the eyes of Justice, then cheating, fraud and lies prevail.

On the default judgement dated 9/10/19 Judge Caproni stated "and (4) an inquest on Plaintiff's damages, *see* Fed. R. Civ.P. 55(b)(2)("The court may conduct hearings or make referrals ….when, to enter or effectuate judgement, it needs to …. conduct an accounting; …determine the amount of damages; …establish the truth of any allegation by evidence; or…. investigate any other matter."). Obviously, the Plaintiff being pro-se is trying her best to prove damages. Anything the court can do within its power to determine damages, determine the truth of the sham sale of AANDCO to KDR to put this case to its final resting spot.

Plaintiff request damages be awarded as per valuation of Mr. Shanaz Sukhdeo and to not award damages as per sham sale, and to void the conveyance of the sham sale of AANDCO to KDR.  Request the court to re-visit Plaintiff expenses and attorney fees in the earlier damages submission.

Yours Respectfully,

Jenny Ramgoolie
9402 Calwood Cir,
Spring, TX 77379

Cc: ed@rudofskylaw.com